UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| LIZETTE LUCIO AND | § | |
| MARC ANTHONY LUCIO | § | |
| INDIVIDUALLY AND | § | |
| AS NEXT FRIEND OF | § | |
| M.A.L. | § | |
| | § | |
| VS. | § | Civil Action No.:  _____ |
| | § | |
| BROWNSVILLE CONSOLIDATED | § | |
| INDEPENDENT SCHOOL BOARD, | § | |
| FORMER PRINCIPAL AND CURRENT | § | |
| HUMAN RESOURCES DIRECTOR | § | |
| NORMA LINDA GALLEGOS | § | |
| SUPERINTENDENT JESUS H. CHAVEZ, | § | |
| BOARD MEMBER DENISE GARZA, | § | |
| BOARD MEMBER DANIELA | § | |
| LOPEZ-VALDEZ, | § | |
| BISD CHIEF OF POLICE | § | |
| OSCAR GARCIA, | § | |
| OFFICER ISRAEL TAPIA, AND | § | |
| OFFICER PATRICK GABBERT | § | |

## **COMPLAINT REQUESTING INJUNCTIVE AND DECLARATORY RELIEF**

The Plaintiffs, LIZETTE LUCIO AND MARC ANTHONY LUCIO, INDIVIDUALLY AND AS NEXT FRIEND OF M.A.L, move the Court for entry of Judgment in their favor against the BROWNSVILLE CONSOLIDATED INDEPENDENT SCHOOL BOARD, NORMA LINDA GALLEGOS, SUPERINTENDENT JESUS H. CHAVEZ, BOARD MEMBER DENISE GARZA, BOARD MEMBER DANIELA LOPEZ-VALDEZ, BISD CHIEF OF POLICE OSCAR GARCIA, OFFICER ISRAEL TAPIA, AND OFFICER PATRICK GABBERT and in support of such Complaint state as follows:

1

## Nature of Action, Jurisdiction and Venue

1.  This is a civil action under 42 U.S.C. § 1983 seeking declaratory and injunctive relief against Defendants for committing acts, under color of law, with the intent and for the purpose of depriving Plaintiff of rights secured under the Constitution and laws of the United States, retaliating against Plaintiff s.  Defendants BISD and Norma Linda Gallegos, violated United States Constitution First, Fourth and Fifth Amendment rights and rights protected under the Texas Constitution Art. 1, §§ 8, 9, and 10 of Marc Lucio, by retaliating against Marc Lucio for refusal to shake certain politician's hands.  Further, by detaining, interrogating, and searching Marc Lucio and M.A.L. these sections of the United States and Texas Constitutions were violated, in particular, by application of the terms of a student policy handbook that permitted illegal interrogation, arrest, and search.

2.  This case arises under the following:

**United States Constitution 42 U.S.C. § 1983.** (Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.)

2

**United States Constitution 42 U.S.C. § 1988.**   In any action or proceeding to enforce the above provision "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.…"

**28 U.S.C. § 1331.**   The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**28 U.S.C. § 1343.**   (a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:  (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;  (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

**28 U.S.C. § 2201.**   (a) In a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

**28 U.S.C. § 2202.**   Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

**U.S.C.S. Fed. Rules Civ. Proc. R. 57.**   These rules govern the procedure for obtaining a declaratory judgment under 28 U.S.C. § 2201. Rules 38 and 39 govern a demand for a jury trial.

The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate. The court may order a speedy hearing of a declaratory-judgment action.

3.  Plaintiffs LIZETTE LUCIO AND MARC ANTHONY LUCIO INDIVIDUALLY AND

AS NEXT FRIEND OF M.A.L., bring this action to enjoin and declare unconstitutional and in violation of statutory restrictions the illegal actions of defendants.

4.  This Court is an appropriate venue for this action pursuant to 28 U.S.C. 1391(b)(1) and (2) A civil action may be brought in—

>    (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

>    (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;

The actions complained of took place in this judicial district; evidence and grievance records relevant to the allegations are maintained in this judicial district; Plaintiffs and Defendants reside in this judicial district.

**Parties**

5.  Plaintiffs Lizette Lucio and Mark Anthony Lucio are mother and father of Plaintiff M.A.L. and reside in Brownsville, Cameron County, Texas.  They bring this claim individually and as next friend of M.A.L.

6.  Defendant Brownsville Independent School District (hereinafter, the District) is a proper party under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  It is a local government "person" subject to suit under Section 1983 of Title 42 of the United States Code. Gallegos,

4

Chavez, Garza, Lopez-Valdez, Garcia, Tapia, and Gabbert are individuals residing in this district who acted under color of law.

## CAUSES OF ACTION

### COUNT ONE

**Cause of Action No. 1:  Refusal to Shake hands is protected free speech and Marc Lucio continues to be retaliated against by Defendants for this Action.**

**Facts**

7. Mr. Lucio spoke "as a citizen."  On May15, 2023, Mr. Lucio took 33 students who had competed in a TPSA in State Competition in Allen, Texas in which the students competed in report writing, building search, anthropology, foot pursuit, and forensics.  This was after they had qualified in Regional Competitions in Corpus Christi, Texas.  Mr. Lucio was a sponsor and escort for a weekend and personally coached the building search team of four students, four of whom competed.  Also, he coached the foot pursuit team in which he trained three students.  The building search team took third place in state competition and a second-place finish in foot pursuit, competing with students from all over the state.  Mr. Lucio had earlier started the club and structured the team.  On May 12, 2023, a week after their successful competition, an e-mail was sent to several sponsors, including Marc Lucio and to Principal Amy Garza Limon that the BISD School Board wished to congratulate the students on May 15,2023.  This was a purely political event after all the student-related activities were terminated.  Upon arrival, they were escorted to the chambers where school board meetings are held.  This was at a regularly scheduled board meeting.  The students all went through and shook the hands of a row of school board members and employees of the District.  The first one in line was employee of the school district and a

5

lawyer, though at this time he was acting as an administrator, greeting and congratulating the successful school team.  Mr. Lucio chose not to shake Miguel Salinas' hand, because during previous contacts, he felt Salinas had been rude.   Further, he believed in this rudeness, Salinas was not advocating for his client, but rather, attempting to investigate and pass judgment on policy, as an investigator and administrator.  Mr. Lucio believed that this was of public concern.  Because Salinas, posing as a lawyer, acted as an investigator and punitive administrator, the public should know about his inappropriate conduct.  Mr. Lucio believed it would give the wrong message to the public if he shook hands, especially in front of photographers.  Mr. Lucio, until this attack on his character, had a good reputation that would influence others who would vote for School Board Members, and he did not wish to lend his political support to Salinas.  In lieu of shaking hands, he told Mr. Salinas and each of the others with whom he refused to shake hands, "Thank you.  God bless you."  He wished to show he was acting courteously but did not want to be photographed in a way that falsely represented his beliefs.

8. The first Board Member with whom he refused to shake hands was Eddie Garcia.  Mr. Lucio believed Eddie Garcia had acted in an arbitrary manner in refusing to review evidence in a grievance that was previously filed against BISD.  Mr. Lucio believed Eddie Garcia further failed to do his job as an administrator by not intervening in the spoliation of exculpatory evidence against him. Exculpatory body camera footage, security camera evidence and Defendant Linda Gallegos' cell phones were never produced after being requested by Mr. Lucio's union lawyer through public information requests.    Mr. Lucio was clear in his opinion at that point that Eddie Garcia was not fit for his job, and he intended to vote against him.  He was especially persuaded of Garcia's lack of fitness for public office because Garcia had previously served in the United States Military and the Brownsville Police Department and was not upholding the standards of

integrity of these institutions.  Mr. Lucio did not wish to be photographed shaking Garcia's hand. Mr. Lucio will vote against Eddie Garcia in his current race for Cameron County Tax Assessor Collector and did not want a false image of an endorsement of him by shaking his hand.

9. The second Board Member with whom he refused to shake hands was Daniela Lopez Valdez.  Similarly, Mr. Lucio believed she acted in an arbitrary manner in refusing to review evidence, and further failed to do her job as an administrator by insisting on production of a videotape or acknowledging that videotape did not exist.  Exculpatory body camera footage, security cameras and Defendant Linda Gallegos' cell phones were not when requested by Mr. Lucio's union lawyer through public information requests, yet Lopez-Valdez failed to require evidence in deciding against Lucio.    As a result, Mr. Lucio believed Daniela Lopez Valdez was not fit for her job, and Mr. Lucio intended to vote against her.   He did not want a false image of an endorsement of her by shaking his hand.

10. The third Board Member with whom he refused to shake hands Denise Rene Garza. Mr. Lucio refused to shake her hands for the same reasons he refused to shake the hands of the other two Board members.  He believed he had a right to pick and choose the candidates he would support.

11. The fourth Board Member with whom he refused to shake hands was Board President Jessica G. Gonzalez.  Like the three Board members described above, he believed from her conduct at an earlier meeting that she was unfit for office and intended to politically oppose her.

12. Mr. Lucio refused to shake the hand of then Superintendent Rene Gutierrez.  Because Gutierrez similarly failed to act appropriately through the grievance process, Mr. Lucio did not want to be seen endorsing him in any manner.  Gutierrez was potentially up for renewal and his reappointment would be a political issue and Mr. Lucio did not want to lend support to his

reappointment.  About six months later, Gutierrez moved on to a different job.  On May 19, 2023, Superintendent Rene Gutierez signed a Notice of Warning against Marc Lucio that was served by BISD Chief of Police Oscar Garcia.  The current Superintendent Jesus H. Chavez, despite pleas to correct the wrongful actions of Gutierrez, persevered in supporting Gutierrez' wrongful conduct.

13. With each of four Board Members, the school attorney who was acting in an administrative position, and the Superintendent with whom he refused to shake hands, he did tell them, "Thank you.  God bless you."  He wished to show he was acting courteously but did not want to be photographed in a way that falsely represented his beliefs.

14. Mr. Lucio did shake the hands of three other Board Members who he did respect and who he was willing to be seen endorsing.  These included Board Members Minerva Pena, Carlos Elizondo, and Frank Ortiz.  He also shook hands with other employees in the line.

15. Immediately after this action, Board Members Garza and Lopez-Valdez were heard to say Mr. Lucio "should be fired" for his actions.  On May 15, 2023, Marc Lucio was sanctioned for failure to shake hands with Board Members.  This "Notice of Warning" was served by BISD Chief of Police, and a copy is attached as Exhibit "A."

16. Later, his action was used as a teaching tool to discuss unruly employees using a thinly veiled reference to his case, purportedly deleting references to him, but clearly showing who was the target of the "teaching."  This retaliation and threat of retaliation is ongoing and has a chilling effect on his expression of free speech and a similar chilling effect on other teachers.  Although Marc Lucio comes from a Brownsville political family, has an impeccable record including distinguished military service, and has been encouraged by his large and extended group of family and friends to stand for public office, he is deterred by the actions of the defendants.  Only by

8

having their actions declared unconstitutional and thereby having this stain removed from his name

can he regain his previous status in the community.

**First Amendment and Tex. Const. art. I, § 8.**

1.1 Mr. Lucio's refusal to shake hands is protected free speech. The First Amendment's

protections extend to "teachers and students," neither of whom "shed their

constitutional rights to freedom of speech or expression at the schoolhouse gate."

*Tinker v. Des Moines Independent Community School Dist*., 393 U. S. 503, 506, 89 S.

Ct. 733, 21 L. Ed. 2d 731 (1969); see also *Lane v. Franks,* 573 U. S. 228, 231, 134 S.

Ct. 2369, 189 L. Ed. 2d 312 (2014). *Kennedy v. Bremerton Sch. Dist.,* 142 S. Ct. 2407,

2423 (2022)

1.2 Review under the *Pickering-Garcetti* framework: "To account for the complexity

associated with the interplay between free speech rights and government employment,

this Court's decisions in *Pickering v. Board of Ed. of Township High School Dist. 205,*

*Will Cty.,* 391 U. S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968), *Garcetti,* 547 U. S.

410, 126 S. Ct. 1951, 164 L. Ed. 2d 689, and related cases suggest proceeding in two

steps. The first step involves a threshold inquiry into the nature of the speech at issue.

If a public employee speaks "pursuant to [his or her] official duties," this Court has

said the Free Speech Clause generally will not shield the individual from an employer's

control and discipline because that kind of speech is—for constitutional purposes at

least—the government's own speech. Id., at 421, 126 S. Ct. 1951, 164 L. Ed. 2d 689.

At the same time and at the other end of the spectrum, when an employee "speaks as a

citizen addressing a matter of public concern," our cases indicate that the First

Amendment may be implicated, and courts should proceed to a second step. Id., at 423,

9

126 S. Ct. 1951, 164 L. Ed. 2d 689. At this second step, our cases suggest that courts should attempt to engage in "a delicate balancing of the competing interests surrounding the speech and its consequences." *Ibid*. Among other things, courts at this second step have sometimes considered whether an employee's speech interests are outweighed by "'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Id., at 417, (quoting *Pickering,* 391 U. S., at 568. *Kennedy v. Bremerton Sch. Dist.,* 142 S. Ct. 2407, 2423-24 (2022).

Teachers and coaches often serve as vital role models. But this argument commits the error of positing an "excessively broad job descriptio[n]" by treating everything teachers and coaches say in the workplace as government speech subject to government control. *Garcetti,* 547 U. S., at 424.

If viewed through the lens of the Free Speech clause, a government entity normally must satisfy at least "strict scrutiny," showing that its restrictions the Mr. Lucio's rights serve a compelling interest and are narrowly tailored to that end.

1.3  Marc Lucio's refusal to shake hands of elected school board members was a form of expression.  See *Clark v. Cmty. for Creative Non-Violence,* 468 U.S. 288, 294, (1984) ("A message may be delivered by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative."); *Texas v. Johnson,* 491 U.S. 397, 404, (1989); *Tenafly Eruv Ass'n v. Borough of Tenafly,* 309 F.3d 144, 160 (3d Cir. 2002).

17. Mr. Lucio spoke on a matter of public concern.   "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers,* 461 U.S. 138, 147-48, (1983). The notion of "public concern" is a broad one, which incorporates many values; it is not a bright-line rule. The underlying principle is that the speech in question must benefit the process of self-government or facilitate informed decision-making by the electorate. See, e.g., *Connick,* 461 U.S. at 145; *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois,* 391 U.S. 563, 570, (1968); *Azzaro v. County of Allegheny,* 110 F.3d 968, 977 (3d Cir. 1997). Such speech includes statements concerning "actual or potential wrongdoing or breach of public trust on the part of [an elected official]" that would be relevant in evaluating that official's performance. *Connick,* 461 U.S. at 148.

18. Mr. Lucio's protected First Amendment activity was a "substantial or motivating factor in the retaliation against him.  See generally 22 Am. Jur. 3d *Termination or Demotion of Public Employee In Relation For Speaking Out As a Violation of Right of Free Speech* § 16 (1993).  The grievance at which he believed he was treated in an unprofessional manner was his attempt to return to his teaching position at Veteran's Memorial Early College High School.    He was sanctioned for this by service of Exhibit "A" and the later use of him as teaching example for misconduct.  The language used against him was that had committed against Gutierrez as acting against "myself (Gutierrez)in a derogatory display of unprofessional conduct."  Further, that his was a "blatant display of disrespect" when he shook the hands of "the remaining Board members and took a photography" who he was willing to politically endorse.  Further, Mr. Lucio was told her actions were "personally abhorrent, they were made worse because you were representing your school and your students."  The Notice goes forward to state that he was violated the Educators'

11

Code of Ethics requiring "good moral character" and that he be "worthy to instruct or supervise the youth of this state."

19. The students had already been through the photo shoot at the time Mr. Lucio went through.  Despite Defendant Gutierrez strong feelings about someone refusing to shake his hand, to the extent that Mr. Lucio's actions had any impact on the students, it would be one of good example.  We all should have a right to refuse to shake Mr. Gutierrez' hand as an expression of our free speech and we should have the courage to do so.  Defendants have no legitimate reason for disciplining Mr. Lucio.

**Texas Constitution**

20. The chilling effects of using Marc Lucio as a teaching tool for how not to behave is also prohibited by the Texas Constitution.  The Texas Constitution provides a floor beneath which protected rights may not fall, even though more may be required than under the Texas Constitution.

21. The Texas Supreme Court has established that the Texas Constitution protection of free speech is greater than that of the First Amendment:

> Our Constitution provides, in part:  Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. Tex. Const. art. I, § 8.  The language enjoined here evoked no threat of danger to anyone and, therefore, may not be subject to the prior restraint of a temporary injunction. Defamation alone is not a sufficient justification for restraining an individual's right to speak freely. *Ex parte Tucker*, 110 Tex. 335, 220 S.W. 75, 76 (1920).  Because the decision of the court below conflicts with article I, section 8 the Texas Constitution and *Ex parte Tucker, supra*, we grant the application for writ of error and, without oral argument, reverse the judgment of the court of appeals and dissolve the temporary injunction. Rule 483.  *Hajek v. Bill Mowbray Motors, Inc.*, 647 S.W.2d 253, 255 (Tex. 1983).

And later confirmed:  "Today we adopt a test recognizing that article one, section eight of the **Texas Constitution** provides *greater rights* of free expression than its federal equivalent." *Davenport v. Garcia*, 834 S.W.2d 4,10 (**Tex.** 1992)

## COUNT TWO

**Cause of Action 2:  Interrogation of the child, MAL, seizure of his telephone, withholding and spoliation of evidence pertinent to exculpating MAL and retaliation against the child and against his parents for trying to protect his rights in violation of the statutory protections and constitution and should be permanently restrained and declared unconstitutional. Need for an injunction.**

22. Retaliation against the Lucio family for insisting on the child's rights has been fierce and is ongoing.  Another student, M.G. made a false report against M.A.L. claiming he made an improper video of her and circulated it among other students on May 12, 2022, which she recanted through her mother on July 27, 2022, and admitted that no video existed.  On May 13, 2022, Marc Lucio was accused of telling M.G. not to report his son, M.A.L.'s action or he would "tell her parents."  This was false and the defendant's claimed video evidence supporting this allegation was never produced because it never existed.  On May 12, 2022, without a warrant or probable cause, defendants seized a phone belonging to Marc Lucio and being used by his son M.A.L.  On May 12, 2022, Defendant Gallegos ordered a "perp walk" out of the building of Marc Anthony Lucio by an armed police officer, two security guards, and two members of her administration in view of many teachers and students.  He was then ordered not to return to work.  During their dealings with Lizette Lucio, Defendant Gallegos verbally abused Lizette Lucio and made clandestine recordings of Lizette Lucio for defending her son.  In defending and covering up their

illegal actions, defendants have used Ad Hominem attacks against her character.  On August 4, 2022, the District sent a letter of sanction to Marc Lucio telling him that he had violated policy by statements he had made to M.G. that had already been recanted.   Carmelita Rodriguez, then Human Resources Director, insisted that he admit to false statements that would have incriminated him and his so M.A.L., which he refused to do.  He appealed this sanction and was rejected at each step of the process. This rejection included failure to produce the evidence on videotape that defendants had falsely claimed existed.  The school board attorney and four school board members refused to request production of the evidence and failed to respond to a freedom of information act request by his attorney, but sanctioned Marc Lucio anyway.  This refusal to provide evidence in response to the freedom of information act requests of his lawyers has been repudiated by the Texas Attorney General's Office as evidenced by Exhibit "B."   For example, the finding includes that the BISD District "failed to comply with procedural requirements" information asking for exemption from public disclosure.   The District was cautioned that their failure to provide the Attorney General with requested information deprived the Attorney General of the ability to determine whether information may be withheld.  The Attorney General found the District had failed to adopt procedures to respond to a FOIA request.  As described above Mr. Lucio on May 15, 2023, Marc Lucio was further sanctioned for failure to shake hands with Board Members.  This "Notice of Warning" was served by Defendant BISD Chief of Police.

23. Sanctions against Marc Lucio harmed him in the following ways:  The Notice, "teaching tool" using him as an example put a permanent mark on his records which chill future speech and adversely impact his career as a teacher.  The "perp walk" caused a rumor in the community that he had been charged with a sex offense that required many denials and explanations.  The forced transfer to another school.  This is against the backdrop of a sterling

14

teaching career.  Mr. Lucio is 47 years old and graduated from Hannah High School in Brownsville in 1994 and received a B.S. from UTRGV in Health and Human Performance.  He was always a hard worker.  In High School he worked as a cook at Long John Silvers and then in other jobs in restaurants and merchandising.  He worked at the Cameron County Jail as a booking officer and training officer.  He married Lizette in 2006 and they began a family.  Soon after, he joined the United States Army and served for nine years.  He worked as a water purification specialist.  He was deployed Stateside to Saint Louis and then later to Kuwait and Baghdad, Iraq.  He worked as a force protection NCO and was responsible for the morale and wellbeing of the soldiers stationed there.  He was selected as physical fitness instructor for his battalion.  He was awarded the Audie Murphy medal based on his service and served as a coach for the Audie Murphy programs.    He was present at Fort Hood in Killeen when there was a mass shooting by an Army major and physician, Nidal Malik Hasan.  At Camp Striker in Baghdad he organized health and morale activities, including a Super Bowl celebration and a Charro Days for the troops.  After his service in Iraq he returned to the Cameron County Jail as a transport officer and return to college to work on his college degree in hopes of becoming a coach.  When he started work at BISD at Veteran's High School, he coached baseball, football, and basketball.  It was a great joy for him to be able to anticipate coaching in the same schools his two sons MAL and V.A.L. would be attending. When the retaliation against him included transferring him out of Veteran's, several programs in both sports and law enforcement he was developing were interrupted.  He believes that his career has been greatly hindered by the sanctions against him and that they preclude him from returning to higher paid law enforcement work.  All hopes he had of public office were ruined by the actions of defendants.

24. Sanctions against Lizette Lucio harmed her in the following ways:  By wrongfully attacking her husband and son, she has been forced to spend most of her waking hours when not at work gathering evidence and explaining that neither her husband nor son had been prosecuted for sex offenses.  Also, the actions of defendants have disrupted the family's activities in sports and law enforcement competitions, which were her primary activities before her reputation was attacked by defendants.  Her well-being is joined to theirs and by these illegal actions, she has been harmed.  Ms. Lucio was born Lizette Martinez in Brownsville.  She attended public schools at Villa Nueva in San Pedro.  Later she attended Stell Middle School and graduated from Pace High School in Brownsville in 1993.  She was an athlete in kickball and volleyball, once chosen as MVP.  She worked in an ice cream shop, a clothing store, and for a real estate appraiser.  She received her bachelor's degree in Police Administration in 2008 and served for three years as a Cameron County Juvenile Probation Officer.  She worked in the Cameron County Jail and in the Cameron County District Clerk's office.  She has now served as a teacher in law enforcement for fourteen years.  Under her direction, her students have received many criminal justice awards including the Quiz Bowl, Building Search and been elected organization officers which won them trips to Washington D.C.  Beyond teaching, a law enforcement career, before defendants' attack on her character, has been an option for her.  She has chosen teaching while her children are still in school her youngest graduates in 2026.  She would have been able to make a greater income by moving to a law enforcement job, but she now fears her reputation has been so damaged by defendants' actions that without declaratory relief she will never be able to return to law enforcement work.

25. Sanctions against M.A.L. harmed him as follows:  M.A.L. was subjected to a perp walk and illegal interrogation that labeled him as sex offender to other students and teachers and then

because of threats, his parents were forced to move schools interrupting his varsity football and baseball.  Many parents believe their child has potential for scholarships and a college career, but M.A.L. was objectively a good player.  He started playing baseball when he was three years old and later made a select T-ball team that went to Florida for competition. He made Brownsville All-Stars every year.  He was a football defensive captain from 7th grade through 9th grade.  (This ended with defendants' actions.)  M.A.L. went to baseball Pony All Stars in regional and state competition.  He was selected for a competitive baseball team, the Bravos.  At Veteran's he played football linebacker, fullback, and defensive end.  He scored seven touchdowns his freshman year and was captain of the defense.  He played both offense and defense.  He made the Varsity Baseball Team within three weeks of returning and on January 12, 2024 was told he would be playing 1st base.  This was then taken from him when he was once again tossed out of Veteran's on the pretext that he did not reside in the district.  This ruling is being appealed through the administrative process, but shows the ongoing retaliation against his family.

26. By interrupting his sports activities and moving him to San Benito as an interdistrict transfer he was not eligible for varsity the first year.  His damaged reputation followed him to San Benito and other students have verbally attacked him over this.  He wanted to play with is brother V.L. in high school and this was thwarted.  Because he was moved out of Veteran's he was unable to play summer baseball with the Veteran Chargers and this deprived him of exposure to baseball college scouts.  After he was tossed out of Veteran's, he played junior varsity for San Benito as a defensive tackle and First Base in junior varsity, because he became ineligible for varsity by the transfer.

27. The defendants' actions have interrupted other extracurricular activities as well. For, example, M.A.L. participated in helping special needs, "Down by the Border," wheelchair athletes in the "Find Your Buddy" program. He lost this also, after BISD attack on his reputation.

28. M.A.L. has a pending grievance requesting return to Veteran's. He was rejected at Level 1 hearing and a level 2 hearing. He awaits a level 3 hearing. The issue is whether he should have been forced out of his district based on his place of residence. He is a BISD student based on his home address, 5249 Los Arboles Ave., Brownsville, Texas, based on the TEA District Map, and according to the Bus Route Director of Transportation Bus Route. Even if he were found to be outside the district, he was wrongly transferred out mid-year in violation of the TEA Code. Further, he was forced out of the district because of retaliation against him and his parents for refusing to succumb to the false accusations. M.A.L. was subjected to detention in the office from 12:45 pm until 4 pm and illegal interrogation that labeled him as sex offender to other students and teachers and then he was forced to move schools interrupting his varsity football and baseball.

29. M.A.L., like his parents, aspires to a career in law enforcement and the military. He believes his reputation is damaged and he will not be able to continue in these careers.

30. Both of M.A.L.'s parents have experience in law enforcement. That is the subject they both teach. So, they were aware the actions being taken against their son were violating his rights. When they protested the violation of his rights, all suffered calumny and retaliation.

**The illegal Student Code of Conduct**

31. The violations by the Defendant District and other defendants were carried out by reliance on the Student Code of Conduct which conflicts with statutory and constitutional protections. The Student Code of Conduct states as follows:

*BISD POLICE DEPARTMENT:  Questioning of Students.  The following guidelines shall apply when law enforcement or other lawful authorities desire to question, interview or take a student into custody while on campus.*

1.  *The principal shall verify and record the identity of the officer or other authority and may request an explanation of the need to question or interview the student.*

2.  *Unless the interviewer requests that the parent/guardian or custodial parent not be notified, the principal efforts to notify the student's parents or other person having lawful control of the student, and*

3.  *The interviewer will determine if the principal or designee need to be present during the questioning or interview.  Page XIII.*

**Texas Statutes**

32. By contrast Texas Family Code Section 51.095 states as follows:

*Notwithstanding Section 51.09 (Waiver of Rights), the statement of a child is admissible in evidence in any future proceeding concerning the matter about which the statement was given if:*

*(1)*

*the statement is made in writing under a circumstance described by Subsection (d) and:*

*(A)*  the statement shows that the child has at some time before the making of the statement received from a magistrate a warning that:

*(i)*

*the child may remain silent and not make any statement at all and that any statement that the child makes may be used in evidence against the child;*

*(ii)*

*the child has the right to have an attorney present to advise the child either prior to any questioning or during the questioning;*

*(iii)*

*if the child is unable to employ an attorney, the child has the right to have an attorney appointed to counsel with the child before or during any interviews with peace officers or attorneys representing the state; and*

*(iv)*

*the child has the right to terminate the interview at any time;*

*(B)*

*and:*

*(i)*

*the statement must be signed in the presence of a magistrate by the child with no law enforcement officer or prosecuting attorney present, except that a magistrate may require a bailiff or a law enforcement officer if a bailiff is not available to be present if the magistrate determines that the presence of the bailiff or law enforcement officer is necessary for the personal safety of the magistrate or other court personnel, provided that the bailiff or law enforcement officer may not carry a weapon in the presence of the child; and*

**(ii)**      *the magistrate must be fully convinced that the child understands the nature and contents of the statement and that the child is signing the same voluntarily, and if a statement is taken, the magistrate must sign a written statement verifying the foregoing requisites have been met;*

33. These differences are stark and show the inadequacy of the school policy for police interrogation.  The school abandons requirements for warnings, lawyers, magistrates, a written statement, and an understanding of the contents of what the child is signing.

34. The Texas Family Code requirements set a minimum for constitutional questioning of a child.  In reviewing the application of Texas Family Code protections Texas courts have found that a child questioned in school requires the protection of Texas Family Code requirement that the child be brought before a magistrate before questioning.

35. By adopting a written policy that ignores both statutory and constitutional protections, the school district has given itself permission to regularly act in a lawless manner.

36. **Texas Family Code Section 51.095.**    Section 51.095 of the Texas Family Code outlines the admissibility requirements for a child's statement. Subsection (a)(1) requires that the child's statement be made in writing, *signed in the presence of a magistrate*, (emphasis added) and only made after the child has received the required warnings. These warnings include the right to remain silent, the right to have an attorney present, and the right to terminate the interview at any time.  To the extent these requirements are not strictly met, the child's statement will be found to be involuntary.  The Texas Court of Criminal Appeals in *State v. Torres*, 666 S.W. 735 (Tex Crim App 2023), found that a magistrate failed to determine whether a juvenile's statements were made voluntarily or involuntarily, rendering them inadmissible.  *In the Matter of JJ*, 651 S.W.3d 385(Tex. Ct. App.—Houston (1st Dist. 2022) an *en banc* hearing held that the juvenile's confession resulted from a custodial interrogation without the required statutory warning.  A

20

juvenile who was in custody during an interrogation conducted in a school, where he had no control over the environment, should have been brought before a magistrate and given the warnings required by Texas Family Code Section 51.095.

37. The protection against interrogating a child provided in the Texas Family Code are a codification of protections mandated by the United States and Texas Constitutions.

**United States Constitution**

38. The purpose of juvenile courts is "rooted in social welfare philosophy rather than in the corpus juris. Its proceedings are designated as civil rather than criminal. The Juvenile Court is theoretically engaged in determining the needs of the child and of society rather than adjudicating criminal conduct." *Kent v. United States,* 383 U.S. 541 (1966).

39. Some of these rights also apply to adults:  Involuntary confessions are a violation of the Fifth Amendment's protection against self-incrimination and the due process clause of the Fourteenth Amendment. *Miranda v. Arizona* 384 U.S. 436 (1966) the Court established that confessions must be voluntary, and any coercion, either physical or psychological, undermines their voluntariness.  *Withrow v. Williams* 507 U.S. 680 (1993).

40. However, protection of children provides greater protection:  For the protection of children, the age of a juvenile is an important factor in determining voluntariness.  When a 13-year-old student confessed during questioning by police at school, without receiving Miranda warnings prior to the commencement of questioning, remand was warranted regarding the denial of his motion to suppress his statements because a child's age properly informed the Miranda custody analysis.  *J. D. B. v. North Carolina*, 564 U.S. 261 (2011).  *In re Gault*, 387 U.S. 1 (1967), extended Fifth Amendment privileges to juvenile delinquency proceedings, thereby ensuring that children would not be "exploited for the information necessary to condemn them before the law."

*Culombe v. Connecticut*, 367 U.S. 568, 581 (1961). The Court noted that it was "frequent practice that rules governing the arrest and interrogation of adults by the police are not observed in the case of juveniles." *Gault,* 387 U.S. at 14. Before a self-incriminating statement of a juvenile could be admitted into evidence, the Court demanded clear and unequivocal "evidence that the admission was made with knowledge that he was not obliged to speak and would not be penalized for remaining silent." Id. at 44.  *In re L.M*., 993 S.W. 2d 276, 288-289 (Tex. App. –Austin 1999) a Texas court acknowledges the reasonable person standard for voluntariness includes a consideration of age.

**Texas Constitution**

41. The Texas Constitution guarantees greater protection than does the 4th Amendment:

> Therefore, given the foregoing reasons and the numerous decisions tacitly addressing the "interpretation issue", we now expressly conclude that this Court, when analyzing and interpreting Art. I, § 9, Tex. Const., will not be bound by Supreme Court decisions addressing the comparable Fourth Amendment issue. In reaching this conclusion, we recognize that state constitutions cannot subtract from the rights guaranteed by the United States Constitution, but they can provide additional rights to their citizens. The decisions of the Supreme Court represent the *minimum* protections which a state must afford its citizens. "The federal constitution sets the floor for individual rights; state constitutions establish the ceiling." *Heitman v. State,* 815 S.W.2d 681, 690 (Tex. Crim. App. 1991).

42. We urge that a child's arrest, interrogation, and search is governed, and he is protected by the 4th Amendment.  The Texas Constitution Art. 1, § 9, Part 1 of 2 provides even greater protection.

43. The Student Code of Conduct and the defendants' actions which purport to follow it in these ways violate federal and state, constitutional and statutory law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs LIZETTE LUCIO AND MARC ANTHONY LUCIO, INDIVIDUALLY AND AS NEXT FRIEND OF M.A.L request judgment against Defendants as follows:

For appropriate declaratory relief regarding the unlawful and unconstitutional practices of Defendants.  Differently put, for appropriate equitable relief against all Defendants as allowed by the Civil Rights Act of 1871, 42 U.S.C. Section 1983, including the enjoining and permanent restraining of these violations and direction to Defendants to take such affirmative action as is necessary to ensure that the effects of the unconstitutional and unlawful disciplinary practices are eliminated and do not continue to affect Plaintiff or others.

For an award of reasonable attorney's fees and his costs on his behalf expended as to such Defendants pursuant to the Civil Rights Act of 1871, 42 U.S.C. Section 1988; and

For such other and further relief to which Plaintiffs may show themselves justly entitled.

Signed this 17th day of April 2024.

Respectfully submitted,

/s/ *Ed Stapleton*

_____

**ED STAPLETON**
Texas State Bar Number:  19058400
So. District No. 1501
**SARA STAPLETON BARRERA**
Texas State Bar Number:19058400
So. District No. 1129445

613 E. Saint Charles
Brownsville, Texas 78526
Telephone: (956) 504-0882
Fax: (956) 504-0814

23